UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5 2 07
```

---

BRIAN JORDAN and CREATIVE GROUP
MARKETING, LLC,

        Plaintiffs,

        - against -

CAN YOU IMAGINE, INC. a/k/a
CYI, INC.
HPI HONG KONG LTD., STEVEN
ZULOFF,
and BARRY BENJAMIN,

        Defendants.

---

CYI, INC. d/b/a CAN YOU
IMAGINE, INC., and HPI HONG
KONG LTD.,

      Third-Party Plaintiffs,

        - against -

GARY AHLERT, UNREAL TOYS, LLC
and
JORDAN RESEARCH AND
DEVELOPMENT, LLC,

      Third-Party Defendants.

**OPINION AND ORDER**

04 Civ. 04696 (PKL)

## **Appearances**

PHILLIPS NIZER LLP
Helen Davis Chaitman, Esq.
666 5th Avenue
New York, NY 10103

Attorney for Plaintiffs and Third-Party Defendants

STOLL, MISKIN & BADIE
Howard Charles Miskin, Esq.
350 Fifth Avenue, Suite 4710
New York, NY 10118

Attorney for Defendants and Third-Party Plaintiffs

**LEISURE, District Judge:**

This action arises out of a license agreement for a toy. Plaintiffs move this Court for summary judgment on liability on all of their claims except those against defendants Steven Zuloff and Barry Benjamin, and plaintiffs and third-party defendants move for summary judgment on all counterclaims against them except the claim for common law unfair competition. For the reasons set forth below, the motion is granted in part and denied in part with respect to plaintiffs' claims. Because the motion with respect to the counterclaims is premised on a finding of material breach by defendants, the motion is denied with respect to third-party defendants.

### Background

This case concerns a license agreement made by plaintiffs Brian Jordan and Creative Group Marketing, LLC ("Creative") and defendants Can You Imagine, Inc. ("CYI") and HPI Hong Kong, Ltd. ("HPI"). Mr. Jordan, an inventor, developed the concept of a handheld toy (the "Toy"), called the "Air Bazooka," that shoots a gust of wind. (See P's 56.1 ¶¶ 1-2, PTO Stip. Fact 9.) On November 27, 2001, Mr. Jordan, Mr. Jordan's agent Creative, and Creative's sub-agent How Rich Unlimited LLC ("How Rich") executed a license agreement whereby Creative granted CYI and HPI an exclusive license to manufacture and sell the Toy and to use any associated trademarks. (See P's 56.1 ¶ 5; Chaitman Decl.

3

Ex. 5). While this agreement was in effect, Steven Zuloff, who describes himself as an independent consultant working for HPI, modified the design of the Toy. (P's 56.1 ¶ 7; Chaitman Decl. Ex. 6.) Mr. Zuloff and an independent contractor working for CYI renamed the Toy the "Airzooka." (See Chaitman Decl. Ex. 7; Miskin Decl. Ex. J.) On June 11, 2003, the license agreement was terminated. (See Chaitman Decl. Ex. 1; Miskin Decl. Ex. Q.)

On August 4, 2003, a new license agreement (the "License Agreement") was executed. (See Chaitman Decl. Ex. 11.) The parties remained largely the same, but R&R Licensing Ltd. ("R&R") replaced How Rich as Creative's sub-agent. (See id.) The terms of the License Agreement were similar to those of the previous license agreement; however, certain material changes were made. (Compare Chaitman Decl. Ex. 5 with Chaitman Decl. Ex. 11.) As in the previous license agreement, the License Agreement granted CYI and HPI the exclusive right to manufacture and sell the Toy and to use "the trademark(s) . . . that may have vested there from, that are presently or may have been used in connection with the Licensed Item."[1] (Chaitman Decl. Ex. 11 ¶ 1.1(a).)

The License Agreement contained the following provisions, which are pertinent to this motion: (1) HPI and CYI were

---

[1] The License Agreement defines the "Licensed Item" as "Air Bazooka – A hand held device where the user pulls back the rubber diaphragm and upon release a burst of air is capable of knocking down targets several feet away."

4

required to maintain product liability insurance in an aggregate amount of at least two million dollars per occurrence with a two million dollar umbrella liability policy, and the policies were to name Creative, R&R and Mr. Jordan as additional insureds (Chaitman Decl. Ex. 11 ¶ 5); (2) HPI and CYI agreed that they would sell the Licensed Item to Creative at 15% above HPI and CYI's raw cost (Chaitman Decl. Ex. 11 ¶ 1.5); (3) patent and trademark applications for the Licensed Item were to designate Brian Jordan as inventor, unless otherwise required by law, and trademark applications were to indicate Creative and Mr. Jordan as owners (Chaitman Decl. Ex. 11 ¶¶ 10, 22); and (4) HPI and CYI were to make quarterly payments of royalties due under the agreement to Creative (Chaitman Decl. Ex. 11 ¶ 2.1[2]).

The relationship between the parties under the License Agreement was not harmonious. During the spring of 2004, counsel for the parties exchanged letters discussing disputes that had arisen during the course of the relationship. (P's 56.1 ¶ 25; D's 56.1 ¶ 25). Among the issues plaintiffs raised were allegations that defendants had violated each of those provisions of the License Agreement enumerated above. (See Chaitman Decl. Ex. 20). On June 1, 2004, plaintiffs' counsel sent a letter to defendants' counsel purporting to terminate the

---

[2] The License Agreement has two paragraphs marked 2.1. This reference is to the first paragraph 2.1.

License Agreement and citing alleged breaches of the License

Agreement. (P's 56.1 ¶ 25; D's 56.1 ¶ 25; Chaitman Decl. Ex.

21). Defendants' counsel responded that plaintiffs' attempt to

terminate the License Agreement was inconsistent with the

License Agreement and without effect. (See Miskin Decl. Ex. BM).

Plaintiffs brought this action seeking to resolve the

dispute regarding the termination of the License Agreement and

disputes arising out of the relationship. Namely, plaintiffs

claim that the defendants breached the contract in four ways:

(1) defendants failed to comply with the insurance requirement

of the agreement, (2) defendants failed to sell the product to

plaintiffs at "raw cost" as required by the agreement, (3)

defendants filed patent and trademark applications in violation

of the agreement, and (4) defendants failed to pay royalties due

under the agreement. Plaintiffs claim that they terminated the

License Agreement in response to these breaches but that

defendants continued to market the Toy without license.

Plaintiffs claim that, by continuing to market the Toy and by

continuing to use the Airzooka mark even after plaintiffs had

terminated the License Agreement, defendants competed unfairly

against plaintiffs, infringed on plaintiffs' trademark, and

falsely marked the Toy they marketed in violation of 35 U.S.C. §

292. The parties have completed discovery. After the parties

submitted a Joint Pretrial Order, plaintiffs and third-party

defendants brought this motion for summary judgment on the question of liability.

## Discussion

### I.   Summary Judgment Standard

Summary judgment is a tool used by district courts "to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997); accord United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 355 (2d Cir. 1993)("Summary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict."). To that end, district courts are directed to issue summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A court may grant summary judgment "'only if it can be established that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 367-68 (2d Cir. 2003) (quoting Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co., 303 F.3d 419, 423 (2d Cir. 2002)). Of course, "'the mere existence of some alleged factual

7

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Id. at 368 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986)). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" N.Y. Stock Exchange, Inc. v. New York, N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248)). The relevant substantive law will identify which facts are material for the purposes of summary judgment. Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, a district court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975) (Kaufman, C.J.) (citing Adickes v. Kress & Co., 398 U.S. 144, 157 (1970); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); accord LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995) ("'The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'"

(quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994))); Patrick v. LeFevre, 745 F.2d 153, 158 (2d Cir. 1984) (Kaufman, J.). If there exists "any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).

The Court evaluates plaintiffs' claims in light of this standard to determine whether plaintiffs have demonstrated that they are entitled to a judgment as a matter of law. Plaintiffs claim that defendants breached two provisions of the License Agreement and seek summary judgment on liability for these two alleged breaches. Plaintiffs also contend that the defendants breached two other provisions of the License Agreement, although they do not claim these additional breaches in their amended complaint. However, plaintiffs argue that all of these breaches were material and that any one of the four breaches provided them with valid grounds to terminate the License Agreement. Plaintiffs claim that, because the License Agreement was validly terminated, defendants' continued marketing of the Toy constituted unfair competition, trademark infringement, and false markings. Accordingly, plaintiffs seek summary judgment on these claims of unfair competition, trademark infringement, and false markings. The Court begins by assessing each of

9

plaintiffs' four allegations of breach of contract. The Court next evaluates those claims that are contingent on plaintiffs' valid termination of the License Agreement.

II.   Breach of Contract

Plaintiffs' fundamental claim is that defendants breached the License Agreement and that, in response to these breaches of the agreement, plaintiffs validly terminated the agreement. Plaintiffs other claims arise out of this alleged breach of contract. Plaintiffs contend that defendants breached the License Agreement in four ways and seek summary judgment on liability for two of these breaches. The Court addresses these four alleged breaches, in seriatim, below.

When one party materially breaches an agreement, the nonbreaching party may terminate that agreement and sue for total breach. See ARP Films, Inc. v. Marvel Entertainment Group, Inc., 952 F.2d 643 (2d Cir. 1991); Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp., 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (N.Y. App. Div. 1999). "For a breach to be material, it must 'go to the root of the agreement between the parties.'" New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101 (2d Cir. 2006)(quoting Septembertide Publishing, B.V. v. Stein & Day, Inc., 884 F.2d 675, 678 (2d Cir.1989); see also 23 Williston on Contracts § 63:3 (4th ed. 2006)("for a breach of contract to be material, it must go to the root or essence of

the agreement between the parties, or be one which touches the
fundamental purpose of the contract and defeats the object of
the parties in entering into the contract" (quotation marks and
footnotes omitted)). "[I]f a breach is relatively minor and not
of the essence, the plaintiff is still bound by the contract and
may not abandon performance and obtain damages for a total
breach by the defendant." Id.

A.    Insurance

Paragraph five of the License Agreement imposes two
insurance requirements on defendants—a substantive requirement
and a documentary requirement. The substantive requirement is
that CYI and HPI maintain "product liability insurance in an
aggregate amount of not less than $2,000,000 per occurrence with
a $2,000,000 umbrella liability policy, naming [Creative] and
[R&R] and [Mr. Jordan] . . . as additional insured." (Chaitman
Decl. Ex. 11 ¶ 5.) The documentary requirement is that
defendants provide plaintiffs with certificates of insurance
thirty days after the date of the agreement and then annually,
documenting that the required insurance is in place. (See id.)
It is expressed in paragraph five that any breach of this
provision is considered material. Plaintiffs argue on this
motion that defendants breached the substantive insurance
provisions of the License Agreement and that plaintiffs

11

therefore validly terminated the License Agreement. (See P's Memo. of Law at 11-13; P's 56.1 ¶¶ 13d, 35-42.)[3]

Defendants argue that plaintiffs waived the documentary requirement of paragraph five of the License Agreement. However, defendants do not address plaintiffs' claim that defendants violated the substantive insurance requirement of the agreement. The Court addresses both considerations.

1.   Waiver

Defendants argue that plaintiffs waived the documentary requirement of paragraph five of the License Agreement. They put forth two arguments in support of this contention. First, they argue that How Rich waived the requirement in the 2001 license agreement and that this waiver carried over to the new License Agreement. Second, they argue that plaintiffs terminated the 2001 license agreement in part on the grounds that defendants failed to comply with the documentary insurance requirement of that agreement but included an identical provision in the 2003 License Agreement; thus, defendants argue, plaintiffs waived the insurance requirement upon execution of the License Agreement.

"Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been

---

[3] In their complaint, plaintiffs allege that they demanded evidence of insurance from CYI but that CYI and HPI refused to provide any. (Am. Comp. ¶ 24.) However, plaintiffs' 56.1 statement does not make this allegation, let alone provide support for it. (See P's 56.1 ¶ 41.) Accordingly, it is not addressed in this opinion and order.

enforceable." General Motors Acceptance Corp. v. Clifton-Fine
Cent. Sch. Dist., 85 N.Y.2d 232, 236 (1995) (citing Nassau Trust
Co. v. Montrose Concrete Prods. Corp., 56 NY2d 175, 184 (1982)).
Waiver may be established by affirmative conduct or by a failure
to act that evinces the intent to abandon the right. Id. (citing
Hadden v. Consolidated Edison Co., 45 NY2d 466, 469 (1978)).
Where the intention to relinquish a right is "proved through
declarations, acts and nonfeasance which permit different
inferences to be drawn and 'do not directly, unmistakably or
unequivocally establish'" a waiver, the determination of whether
a right has been relinquished is to be made by the finder of
fact. Voest-Alpine International Corp. v. Chase Manhattan Bank,
N.A., 707 F.2d 680, 685 (2d Cir. 1983) (quoting Sillman v.
Twentieth Century-Fox, 3 N.Y.2d 395, 403 (1957)).

Defendants' arguments and evidence of waiver concern the
License Agreement's documentary insurance requirement. They thus
do not demonstrate that plaintiffs waived the substantive
insurance requirements. Accordingly, the claimed waivers do not
put material facts at issue.

First, defendants argue that How Rich waived the
documentary insurance requirement of the 2001 license agreement.
(See Fleischer Decl. ¶¶ 26, 28). Specifically, Howard Fleischer
of How Rich stated that, for the 2001 license agreement, How
Rich was satisfied with Mr. Benjamin's representation about the

13

existing insurance and did not request additional proof of insurance. (Id.) Thus, defendants argue, plaintiffs waived the requirement. However, defendants do not explain how a waiver by How Rich of a requirement of the 2001 license agreement would serve as a waiver of a requirement under the License Agreement, a separate agreement to which How Rich was not a party. Further, defendants do not provide any evidence that indicates that How Rich's alleged waiver of the documentary requirement served to waive the substantive requirement of paragraph five of the License Agreement.

Second, defendants argue that, because plaintiffs had terminated the 2001 license agreement in part on the grounds that defendants had not submitted certificates of insurance (see Miskin Decl. Ex. Q), they waived the documentary requirement by including the same provision in the 2003 License Agreement. The reasoning behind such an argument is opaque. More significantly, however, it again does not address the substantive requirement of paragraph five. Thus there is no support for a contention that plaintiffs waived the substantive, rather than the documentary, requirements of the 2003 License Agreement.

2. Performance

Plaintiffs claim that CYI and HPI breached the substantive requirements of paragraph five of the License Agreement by not taking out the amount of insurance required by the agreement and

14

by not naming Creative, Mr. Jordan, and R&R as additional
insureds on the insurance that was taken out. Plaintiffs provide
three evidentiary bases for this argument: the depositions of
Mr. Zuloff, Harold Uretsky, Barry Benjamin, and Gary Ahlert; the
parties' Joint Pretrial Order; and a certificate of insurance
and a letter from Aon Risk Services, Inc. As discussed below,
plaintiffs' evidence does not demonstrate that there is no
material issue of fact with respect to the insurance carried by
defendants.

First, plaintiffs rely on deposition testimony. Mr. Zuloff,
who said that he is an independent contractor working for
defendant HPI, testified that he did not know whether insurance
was taken out for the Toy. (Chaitman Decl. Ex. 6.) Mr. Uretsky,
the managing director of HPI, testified only that the Toy would
be covered by product liability insurance and that Creative was
not a named insured on the policy. (Chaitman Decl. Ex. 23.) Mr.
Uretsky's testimony does not address the amounts of the
policies, whether CYI and HPI had taken insurance, and whether
Creative, Mr. Jordan, and R&R were listed as additional
insureds.[4] Similarly, Mr. Benjamin, the general manager of
defendant CYI, said that he understood that the insurance
requirements of the License Agreement were satisfied but that he

---

[4] Although an additional insured enjoys the same protection as a named
insured, the terms are not used interchangeably. See Pecker Iron Works of
N.Y., Inc. v. Traveler's Ins. Co., 99 N.Y.2d 391, 393 (2003).

15

did not personally confirm this. (Chaitman Decl. Ex. 22.) Only

Mr. Ahlert, an employee of plaintiff Creative, testified that

defendants did not have the necessary insurance coverage.

(Chaitman Decl. Ex. 49.) However, Mr. Benjamin, a defendant and

an employee of defendant CYI, maintains elsewhere that CYI did

in fact have adequate insurance to meet the amounts required by

the agreement. (Benjamin Decl. ¶ 28.) These depositions thus do

little to establish that there is no issue of material fact with

regards to the satisfaction of the insurance requirements.

Rather, they make clear that there is a genuine issue of fact as

to the insurance CYI and HPI carried.

       Second, plaintiffs contend that, in the Joint Pretrial

Order, defendants admit that they did not comply with the

insurance requirements of the agreement. Specifically,

plaintiffs refer to the portion subtitled "Defendants' and Third

Party Plaintiffs' Summary of Asserted Facts to be Proven," where

defendants assert that "[d]efendants had coverage during the

entire period of the license agreement, with liability coverage

higher than that required by the license agreement. CYI and HPI

had at least $1 million liability coverage and an umbrella

policy of $9 million." (PTO at 20.) Plaintiffs' reading of these

statements—that defendants had less than two million dollars of

liability coverage—is certainly a plausible one; however, it is

not the only plausible reading of this language. Indeed, such a

16

reading is at odds with defendants' immediately preceding statement that they "had coverage during the entire period of the license agreement, with liability coverage higher than that required by the license agreement." (Id.) Further, plaintiffs do not address defendants' contention that the amount of the umbrella policy that exceeds the amount required by the agreement in fact serves as additional liability insurance. If all reasonable inferences are drawn in favor of defendants, it cannot be said that this portion of the Joint Pretrial Order constitutes a concession by defendants that they did not comply with the insurance requirements the License Agreement.

Third, plaintiffs direct the Court's attention to a letter from Aon Risk Services, Inc. and two certificates of insurance. (Chaitman Decl. Ex. 12.) This letter and the certificates indicate that CYI had a one million dollar liability insurance policy and a three million dollar umbrella policy, and they do not indicate that Creative and Mr. Jordan were additional insureds. However, this letter and the certificates do not speak to any insurance that HPI might carry. The License Agreement does not require that each of CYI and HPI carry two million dollars in liability insurance with Creative, Mr. Jordan, and R&R named as additional insureds; rather, it requires that CYI and HPI carry an aggregate of two million dollars in liability insurance and that Creative, Mr. Jordan, and R&R be named as

17

additional insureds to two million dollars in liability
insurance. Again, plaintiffs do not seek to refute defendants
claim that the excess umbrella coverage supplemented the
liability coverage. Thus the Aon letter and certificates, like
the other evidence plaintiffs have brought to the Court's
attention, are insufficient to establish that there is no
genuine issue as to whether CYI and HPI had the insurance
required by the License Agreement. Accordingly, whether
defendants maintained the required insurance remains at issue.

B.    Refusal to Sell

The License Agreement contains a provision whereby CYI and
HPI agree that they will sell Toys to Creative at fifteen
percent above their raw cost. Specifically, paragraph 1.6 of the
License Agreement provides that "[CYI and HPI] shall provide
[Creative] the Licensed Item at 15% above [CYI and HPI's] raw
cost." (Chaitman Decl. Ex. 11.) Plaintiffs claim that the
defendants refused to comply with this provision in material
breach of their obligations under the License Agreement.
Plaintiffs seek summary judgment on the issue of breach.
Plaintiffs also contend that they validly terminated the License
Agreement in response to this material breach by defendants.

There is no genuine issue as to whether defendants breached
this provision of the License Agreement. The parties agree that
plaintiffs gave defendants notice that they wished to buy the

18

Toy from defendants at this price (Joint Pretrial Order at 23).
Defendants do not dispute that they did not sell the Toy to
plaintiffs at this price (D's 56.1 ¶¶ 22, 45). They contend that
instead they offered to sell the product to plaintiffs "at a
specified price," provided that plaintiffs agreed not to sell
the product to distributors or retailers. (D's 56.1 ¶ 22.) Thus,
it is undisputed that defendants did not comply with paragraph
1.6 of the License Agreement. Defendants' refusal to comply with
this provision was in breach of their obligations under the
agreement.

Defendants provide two justifications for their breach of
paragraph 1.6. First, they argue that plaintiffs refused to
provide them with assurances that plaintiffs would not compete
with them by selling the product to distributors or retailers.
Second, they argue that the term "raw cost" is ambiguous.

Defendants' first justification arises from the parties'
conflicting understandings of paragraph 1.5 of the License
Agreement. That paragraph provides that "[i]ncluded non-
exclusively in the grant and reserved also non exclusively for
[Creative] and [Mr. Jordan] only is the right to advertise, sell
and distribute the Licensed Item via the Internet or the World
Wide Web." (Chaitman Decl. ¶ 1.5.) Plaintiffs interpret this
provision as granting them the right to sell Airzookas to any
buyers, including retailers and distributors, over the internet.

19

Defendants contend that, through this provision, plaintiffs retained the right to sell over the internet to retail customers only, not to retailers and distributors. (D's 56.1 ¶¶ 5(d), 13(c).) Defendants claim that they sought assurances from plaintiffs that plaintiffs would not sell the Airzooka to retailers and distributors in competition with defendants. Defendants contend that sale by plaintiffs of the Airzooka to retailers or distributors would violate the exclusive license granted by the License Agreement and thus constitute a material breach the agreement.

However, beyond claiming that "Defendants were left with no choice, but not to provide Airzooka products to Plaintiffs" "in order to protect their own interest under the 2003 Agreement" (D's Memo. of Law at 16), defendants have not sought to explain how the dispute over the exclusivity of the license justified defendants' failure to comply with paragraph 1.6 of the License Agreement.[5] Absent some explanation by defendants as to why they

---

[5] Although defendants do not expressly couch their argument in these terms, it is worth noting that New York courts are reluctant to extend the right to demand adequate assurances of performance beyond insolvency settings, contracts for the sale of goods governed by the Uniform Commercial Code, and closely analogous contracts. See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 468 (1998); Bank of N.Y. v. River Terrace Assoc., LLC, 2005 NY Slip Op 9033, 2 (N.Y. App. Div. 2005)("The Court of Appeals has enjoined the courts to proceed warily in extending this UCC doctrine to the common law of this State"). Defendants here sought assurances from plaintiffs that plaintiffs would not act in a way that defendants argue would be in breach the exclusive licensing provision of a licensing agreement. New York courts have not, and do not appear likely to, extend the doctrine of demand for adequate assurance of future performance to situations such as this.

20

were excused from performing their obligations under the License Agreement—beyond their claim that they wanted to "protect their own interests"—defendants' argument does not demonstrate that the breach could be excusable.

Second, defendants contend that the term "raw cost" in paragraph 1.6 of the License Agreement is ambiguous. Under New York law, the trial court determines as a matter of law whether a contract is ambiguous. Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996). A provision of a contract is unambiguous if it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Waldman v. Riedinger, 423 F.3d 145, 149 (2d Cir. 2005) (quoting Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 988 (2d Cir. 1991) (alteration in Waldman). Likewise, "contract terms are ambiguous if they are 'capable of more than one meaning . . .'" Nowak, 81 F.3d at 1192 (quoting Sayers v. Rochester Telephone Corp., 7 F.3d 1091, 1095 (2d Cir. 1993). In determining whether language in a contract is ambiguous, a court considers "the customs, practices, usages and terminology as generally understood in the particular trade or business." Id. (quoting Sayers at 1095).

21

Here, the parties have not proposed conflicting interpretations of paragraph 1.6. Rather, defendants have merely asserted that the term is ambiguous. Such a bald assertion provides little foundation for a finding that the term is capable of more than one meaning. Further, defendants acknowledge that the term "raw cost" has a trade usage (D's Memo. of Law at 25), undermining the claim that the term is ambiguous in light of the "usages and terminology as generally understood in the particular trade." Sayers, 7 F.3d at 1095.

Defendants' sole argument in support of their contention that the term is ambiguous is that the parties did not intend for the provision to be included in the contract; they do not argue that it is ambiguous on its face. To support their contention that the term is ambiguous because it was not intended to appear in the contract, defendants rely on deposition testimony. However, "'extrinsic . . . evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" Waldman v. Riedinger, 423 F.3d 145, 150 (2d Cir. 2005) (quoting W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 163 (1990).[6]

---

[6] Plaintiffs refer to a portion of Mr. Uretsky's July 22, 2005 deposition that they claim indicates that Mr. Uretsky, the managing director of HPI, did not find the term "raw cost" to be ambiguous. Defendants refer to this portion of the deposition as well and contest plaintiff's interpretation of the deposition. However, there is in fact no mention of the phrase "raw cost" in the portions of that deposition that the parties included with their motion papers. (See Chaitman Decl. Ex. 23; Miskin Decl. Ex. AB.) Thus there is no

22

Thus there is no genuine issue as to whether defendants breached paragraph 1.6 of the License Agreement. Accordingly, summary judgment is granted on liability. However, the parties have not addressed the materiality of this provision of the License Agreement, and thus the materiality of the provision remains genuinely at issue. An immaterial breach by defendants does not provide plaintiffs with a basis for refusing to perform their obligations under the contract and suing for total breach. Thus plaintiffs have not demonstrated that there is no genuine issue of fact regarding whether they validly terminated the License Agreement on the basis of this breach by defendants.

C.   Misappropriation of Intellectual Property

Plaintiffs claim that defendants misappropriated their intellectual property in breach of the License Agreement, providing plaintiffs with further basis for terminating the License Agreement. Namely, plaintiffs claim that defendants breached paragraph 22 of the License Agreement by filing patent applications and trademark registrations for the Toy in their own names. Paragraph 22 of the agreement provides that Brian Jordan is the "sole and exclusive owner of the Licensed Item(s) . . . and the accompanying Trademarks" and that "[a]ll patent applications and patents issued on the Licensed Item(s) as

---

foundation in the record for plaintiff's contention that Mr. Uretsky did not find the term "raw cost" in the License Agreement to be ambiguous.

presented, designate as the inventor (Unless a co-inventor is listed as necessitated by LAW) of this invention the following person: Brian Jordan." Paragraph 10 of the License Agreement provides that HPI and CYI may file "trademark applications related to the Mark, such filings to be made in the name of"[7] Mr. Jordan and Creative as owners and Mr. Jordan and "CO-INVENTOR as may be necessitated by law" as inventors. (Chaitman Decl. Ex. 11 ¶ 10.)

It is undisputed that defendants applied for a design patent in the name of Mr. Zuloff alone and a utility patent in the names of Mr. Zuloff and Mr. Jordan and that both of these applications pertained to the Toy. (PTO Stipulated Fact 11). However, defendants applied for both patents on May 16, 2003 (Miskin Decl. Ex. M; Chaitman Decl. Ex. 17), and the License Agreement was only made as of August 4, 2003. Plaintiffs do not seek to explain how this action could constitute a breach of an agreement that was not yet in effect.

It is also undisputed that defendants filed a trademark application in CYI's name for the trademark Airzooka,[8] (PTO at 22), a trademark that plaintiffs concede CYI at least partially developed (P's 56.1 ¶ 8). This trademark application was filed on March 5, 2003 (PTO at 22), before the effectiveness of the

---

[7] "Mark" is not defined in the License Agreement.
[8] Plaintiffs claim that defendants filed several trademark applications in their own names, but they only refer to evidence of one such application.

License Agreement. Again, plaintiffs do not seek to explain how this action constitutes a breach of the yet unmade agreement.

Plaintiffs also assert that defendants applied for numerous foreign patents in the names of Mr. Zuloff or CYI only. However, they provide no support for this contention. Plaintiffs merely refer to CYI's admission that "the Patent offices in foreign countries had issued numerous patents in the name of CYI or Steven Zuloff." (Chaitman Decl. Ex. 45, Request for Admission No. 33). No information is provided with respect to the subject of these patents or the date of application. This statement alone provides no support to plaintiffs' contention that defendants applied for patents covering the Toy while the License Agreement was in effect. Plaintiffs thus have not demonstrated that defendants made any intellectual property filings in breach of the agreement, let alone that defendants materially breached the License Agreement and entitled plaintiffs to terminate the agreement.

D.    Failure to Pay Royalties

Plaintiffs' final breach of contract claim is that defendants materially breached the License Agreement by not paying plaintiffs the royalties they owed under the agreement. Plaintiffs seek a judgment as a matter of law on the issue of liability. They also claim that defendants' failure to pay

25

royalties was a material breach that justified plaintiffs'
termination of the License Agreement.

"[F]ailure to tender payment is generally deemed a material
breach of a contract." ARP Films, Inc. v. Marvel Entertainment
Group, Inc., 952 F.2d 643, 649 (2d Cir. 1991). Mr. Benjamin
confirmed that CYI did in fact stop paying royalties to
plaintiffs. (Chaitman Decl. Ex. 22 at 94.) Nevertheless, there
remain genuine issues of material fact surrounding the payment
of royalties, and these issues prevent the Court from entering
judgment as a matter of law.

Although defendants concede that they withheld royalty
payments, they contend that they were expressly excused by
paragraph six of the License Agreement from making those
payments. That paragraph provides in essence that if CYI or HPI
notifies plaintiffs of any suspected infringement of any of the
licensed rights in the Toy and if plaintiffs do not prosecute
the infringer, and if the infringer adversely affects the sales
of CYI and HPI, then upon 30 days written notice, CYI and HPI
are to stop paying royalties. Defendants argue that such a
situation existed and therefore that they were excused from
making royalty payments.

It is undisputed that defendants notified plaintiffs both
of the occurrence of an infringement and that they did not
intend to prosecute the infringer themselves. (P's 56.1 ¶¶ 65,

69.) However, whether an infringing product harmed sales of the
Toy remains at issue. Mr. Benjamin and Mr. Uretsky both
testified that the infringement harmed sales of the Toy
(Chaitman Decl. Ex. 35 at 4; Miskin Decl. Ex. AB at 49).
However, Mr. Benjamin also testified that he did not know if any
infringing toys were sold. (Chaitman Decl. Ex. 22 at 94). His
assistant Tony Clemente testified similarly. (Chaitman Decl. Ex.
46 at 59.)

Further, plaintiffs argue that defendants did not comply
with their obligation to cooperate in the prosecution of the
infringer. Paragraph six of the License Agreement provides that,

In the event that any legal action against any third
party is deemed necessary by either [HPI or CYI],
[R&R], [Mr. Jordan] or [Creative] for the protection
of their respective interests in and to the Licensed
Item(s) in the Territory, [HPI and CYI], [R&R], [Mr.
Jordan] and [Creative] shall cooperate with each other
and render all reasonably necessary assistance in
connection with any such action . . .

(Chaitman Decl. Ex. 11 ¶ 6.) Specifically, plaintiffs contend
that defendants delayed in providing them both with the name of
the company that distributed the infringing product in the
United States and with the reports of an investigator they had
hired to investigate the infringement. (See Miskin Decl. Ex. Z.)
In fact, defendants did provide plaintiffs with the name of the
domestic distributor in the same letter that they informed
plaintiffs they were not going to prosecute the case themselves.

27

(Chaitman Decl. Ex. 32). Defendants do not seek to explain why they did not provide the investigator's reports to plaintiffs.[9] However, the current record sheds little light on the value of these reports and thus it remains at issue whether defendants' actions constitute substantial compliance with the obligation to cooperate.

In sum, although there is no issue as to whether defendants withheld royalty payments, there remains an issue as to whether plaintiffs' failure to prosecute the infringing company excused defendants from making royalty payments. Thus plaintiffs have not demonstrated that they are entitled to judgment as a matter of law on this claim.

Plaintiffs have demonstrated that, of the four breaches of the License Agreement that they allege, there is no genuine issue of fact as to one of them. However, as it is not clear from the record that this breach was material, plaintiffs have not demonstrated that their purported termination of the License Agreement was valid as a matter of law.

III. Unfair Competition and Trademark Infringement

Plaintiffs seek summary judgment on their claims that defendants engaged in unfair competition and that they infringed on plaintiffs trademark. First, plaintiffs argue that defendants

---

[9] In their brief, defendants indicate that their lawyer learned of the reports only after plaintiffs had claimed that defendants had breached the contract. (D's Memo. of Law at 31.) However, defendants do not seek to explain how this might excuse their own failure to comply with the agreement.

28

made misrepresentations in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by selling items related to the Toy in packaging indicating that the products are licensed by Creative, exhibiting the Toy's patent mark, and using the "Airzooka" trademark. These representations, they claim, constituted unfair competition.

Plaintiffs argue that, upon their valid termination of the License Agreement, defendants' representations that the items were authorized by plaintiffs were no longer accurate, and defendants no longer had license to use the trademark or patent mark. Plaintiffs acknowledge that this claim is dependent on the Court's determination that the validity of plaintiffs termination of the License Agreement is not genuinely at issue. (See P's Memo. of Law at 27.) As the Court has not so determined, further analysis of this claim would be fruitless.

Second, plaintiffs claim that defendants used the Airzooka trademark[10] without authorization after plaintiffs had terminated the License Agreement. Plaintiffs claim that this continued use of the Airzooka trademark constituted both common law trademark infringement and unfair competition. Plaintiffs claim that they

---

[10] In their memorandum of law, plaintiffs claim that defendants used plaintiffs' trade dress without authorization. However, this claim does not appear in any of the pleadings. Further, plaintiffs' 56.1 statement does not address trade dress. Accordingly, the Court does not address the claim here. See Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000) ("'While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.'") (quoting Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978)).

granted defendants a license to use the Airzooka trademark in

the License Agreement. Upon their termination of the License

Agreement, plaintiffs argue, defendants no longer had authority

to use the Airzooka trademark; yet, defendants continued to use

the trademark. Plaintiffs claim that this continued,

unauthorized use constituted common law trademark infringement

and unfair competition. This claim again is contingent on

plaintiffs' valid termination the License Agreement: if the

License Agreement was not validly terminated, the continued use

of the remains authorized under the License Agreement. As the

validity of the termination of the License Agreement remains

genuinely at issue, further analysis of this claim too is

unnecessary.[11]

IV.  False Markings

Finally, plaintiffs seek summary judgment on their claim

that defendants violated 35 U.S.C. § 292 by using false

markings. 35 U.S.C. § 292 imposes a fine on

> [w]hoever, without the consent of the patentee, marks
> upon, or affixes to, or uses in advertising in
> connection with anything made, used, offered for sale,
> or sold by such person within the United States, . . .
> the patent number . . . with the intent of
> counterfeiting or imitating the mark of the patentee,
> or of deceiving the public and inducing them to

---

[11] Defendants contend that they, not plaintiffs, own the "Airzooka" trademark
and trade dress and thus that their rights to the trademark and trade dress
are independent of the License Agreement. The Court does not now reach this
issue, however, because plaintiffs have not demonstrated that defendants' use
of the trademark and trade dress would constitute infringement and unfair
competition even if defendants did not own the trademark and trade dress.

30

believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; or [w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public.

35 U.S.C. § 292; see Boyd v. Schildkraut Giftware Corp., 936 F.2d 76, 79 (2d Cir. 1991). Plaintiffs have two theories in support of their claim that defendants violated this statute. First, plaintiffs claim that defendants continued to mark the Airzooka with the Airzooka patent marking after plaintiffs terminated the License Agreement. Second, plaintiffs claim that defendants falsely marked the Megazooka and Airzooka key chains—two allegedly derivative Airzooka products that defendants manufactured and marketed—with the Airzooka patent marking.

Summary judgment cannot be granted under plaintiffs' first theory of false markings for the same reason it is not granted on the previous two claims. Plaintiffs' first false markings theory is that defendants improperly marked the Toy with the design patent Mr. Zuloff registered in his own name. Plaintiffs claim that, according to paragraph 8.2 of the License Agreement, all rights plaintiffs granted to defendants reverted to plaintiffs upon termination of the License Agreement and accordingly that, upon termination of the License Agreement, plaintiffs gained all rights to the patent Mr. Zuloff registered. Thus this theory, like the unfair competition and

31

trademark infringement claims, relies on a determination that plaintiffs validly terminated the License Agreement. Because the validity of the termination of the License Agreement remains at issue, summary judgment cannot be granted under this theory of false markings.

Plaintiffs have not borne their burden on their second theory of false markings, and thus summary judgment cannot be granted under that theory either. Plaintiffs have pointed to no evidence that the Airzooka keychain was marked with any indication of a patent. The evidence they cite as supporting their contention plainly does not pertain to the Airzooka keychain. (See P's 56.1 ¶ 34; Chaitman Decl. Ex. 45). Similarly, plaintiffs do not identify any evidence showing that the Megazooka is marketed with the patent number of the Airzooka. Rather, plaintiffs identify evidence indicating simply that the Megazooka was marked with a patent number. (See P's 56.1 ¶ 34; Chaitman Decl. Ex. 45). Plaintiffs have not brought to the Court's attention, in their Local Rule 56.1 Statement or elsewhere, any evidence supporting their contention that the patent marking on the Megazooka is not properly ascribed to the Megazooka. Indeed, the only evidence in the record concerning the patent marking on the Megazooka is defendants' response to plaintiffs' request for admissions. This response reads simply, "CYI . . . admits that a patent number is printed on the

packaging of its Megazooka product." (Chaitman Decl. Ex. 45.)
This admission alone falls short of demonstrating that
defendants falsely marked the Megazooka: there is no evidence
indicating that the Megazooka is not covered by the patent that
is printed on its packaging. Accordingly, summary judgment
cannot be granted on plaintiffs' claim of false markings under
this theory either.

## Conclusion

For the forgoing reasons, plaintiffs' and third-party
defendants' motion for summary judgment is granted with respect
to liability on their Fifth Claim and denied with respect to all
other claims.

**SO ORDERED.**

**New York, New York**

May **2** , 2007

_Peter K. Leisure_

U.S.D.J.

33